hBROWN, Judge.
Scurlock Oil Company (“Scurlock”) was the first purchaser of oil from Maddox and May Brothers Casing Service, Inc. (“M & M”) which operated wells in the Northeast Lisbon Unit (“the Unit”). The owner of the working interest in these wells was Northeast Lisbon Production Company (“Lisbon”).
In 1987, Arkla, Inc. d/b/a Arkansas Louisiana Gas Company (“Arkla”), who supplied natural gas to operate machinery to produce the wells, perfected a lien under the Oil Well Lien Act affecting property in the Unit owned by M & M and Lisbon. In answer to garnishment interrogatories, Scurlock stated that it held proceeds owed to Lisbon for past production. Scurlock, however, claimed it was entitled to these funds as an off-set for additional severance taxes paid on Lisbon’s behalf. Scurlock had paid these taxes in 1984 under protest. A final judgment against the taxpayer was not rendered until 1989, after Arkla’s lien had been filed. The trial court concluded that Scurlock was entitled to the funds. Arkla appeals. We affirm.
FACTS
Louisiana’s Constitution permits a tax upon all resources severed from its soil and water. LSA-Const. Art. 7 Sec. 4. The legislature levied a severance tax pursuant to this constitutional authorization. The tax on oil is 12.5% of its value at the time and place of severance. Recognizing that such a tax on marginal wells would be counterproductive, the legislature reduced the tax rate to 3.125% for low volume or stripper wells. A stripper well is an oil well that is incapable of producing more than ten barrels of oil per day. The severance tax must be withheld by the first purchaser of the oil and paid to the state. LSA-R.S. 47:638.
M & M notified Scurlock that the wells in the Unit were certified as stripper wells. Based on this representation, Scurlock withheld from production proceeds severance taxes at the reduced rate of 3.125% and remitted them to the|2state pursuant to LSA-R.S. 47:633. In 1983, the Louisiana Department of Revenue and Taxation (“the Department”) conducted the first of two audits.
The 1983 audit covered the period of January 1979 to December 1981, and concluded that some wells in the Unit were not entitled to the lower tax rate. Thus, in 1984, additional taxes and interest of $132,048.11 were assessed. Although Lisbon was the taxpayer liable for this deficiency, the Department required Scurlock to pay based upon the purchaser’s duty to withhold and remit the taxes under LSA-R.S. 47:638. Scurlock paid the additional taxes and interest under protest and sought review by the board of tax appeals. The assessment of additional taxes and interest was ultimately affirmed in McNamara v. Scurlock Oil Company, 545 So.2d 1312 (La.App. 1st Cir.1989), writ denied, 550 So.2d 652 (La.1989).
A second audit was conducted by the Department in 1985 which covered the period from January 1980 through December 1984. This audit resulted in additional severance taxes and interest in the amount of $374,-637.66. Scurlock paid part in July 1987 without protest and the remainder pursuant to a compromise in December 1988.
Arkla supplied natural gas to operate compressors used by M & M to produce the Unit. In late 1987, some five years into the natural gas agreement, M & M stopped payments on the gas contract. Arkla filed suit against M & M and Lisbon on December 14, 1987 and obtained a default judgment against M & M for $32,976.02 on February 18, 1988. *1222 Arkla’s lien, perfected under the Oil Well Lien Act, LSA-R.S. 9:4861 et seq., affected property owned by both M & M and Lisbon, including the wells within the Unit, the oil produced therefrom, proceeds from the sale of oil, and all equipment related to the wells.[1]
1 gScurlock was named as garnishee in Ark-la’s action and was asked to respond to garnishment interrogatories. Seurloek ultimately stated that it held $87,788.46 in production proceeds belonging to Lisbon. These funds represented production payments accruing since 1967 on a fractional interest initially owned by an education foundation but transferred to Lisbon.[2] Arkla correctly notes that the proceeds held in suspension represented payment for purchases of oil and that the severance taxes owed by this fractional interest were withheld and remitted to the state. Arkla argues that for the period covered by the audit, additional severance taxes were owed but only to the extent of the interest. Seurloek asserted its entitlement to the funds as an off-set against its claim for the additional severance taxes and penalties paid on Lisbon’s behalf.
Arkla subsequently filed a motion to traverse the answers given to the garnishment interrogatories. Seurloek responded with a memorandum and an affidavit by Don Childs, a special projects manager in Seurloek’s accounting department. The trial judge, relying basically on the facts disclosed by the affiant, concluded that the suspended funds had been offset by operation of law before Arkla instituted its lien. Arkla’s motion to traverse was denied, the petition for garnishment dismissed, and the writ of sequestration released. Arkla appealed. This court concluded that the affidavit relied upon by the trial court did not demonstrate personal knowledge, thus, it was hearsay and improperly admitted. The record, void of this evidence, no longer supported the trial court’s conclusions. The judgment below was vacated and the matter was remanded for the parties to provide additional proof. Arkla, Inc. v. Maddox and May Brothers Casing Service, Inc., 624 So.2d 34 (La.App.2d Cir.1993).
|4On remand, a different trial judge concluded that sufficient evidence was presented to support the original findings. Essentially, the court found that the taxes were due when the oil was severed from the earth, and that Seurloek was obligated to withhold and pay the taxes due. Accordingly, a corresponding offset was simultaneously created against Lisbon in favor of Seurloek. As such, the suspended production payments were not property subject to Arkla’s garnishment. Arkla now appeals this judgment.
DISCUSSION
The subject dispute is squarely framed. Arkla perfected its hen in accordance with the Oil Well Lien Act (“the Act”), LSA-R.S. 9:4861 et seq., and argues that its claim is superior to that of Seurloek. Arkla argues that the judgment affirming the taxpayer’s obligation for the additional taxes was final in 1989 and thus, its hen perfected in 1987 is superior in rank. The Act, however, provides a superior ranking to ah other security interests except for taxes. Seurloek claims a right of off-set for the taxes it paid on Lisbon’s behalf under the theory of compensation and urges the superior ranking of this claim under the Act. While Scurlock’s argument requires some clarification, we deem it meritorious.
First, we note that the Act’s ranking provisions do not bolster Scurlock’s claim. While LSA-R.S. 9:4862(A)(2) grants a superi- or ranking to claims for taxes and certain other privileges, the exception for taxes would seemingly enure only to the benefit of taxing authorities. Seurloek does not seek to tax Lisbon. Rather, Seurloek seeks only to cohect a debt, albeit a debt for tax payments made on Lisbon’s behalf. The exception provided in the Act for taxes is not apphcable under the circumstances. We find, however, that Scurlock’s claim is superior to that of Arkla by operation of law under the doctrine of compensation.
*1223 Compensation takes place by operation of law to extinguish two obligations reciprocally, to the extent of the lesser obligation, at the moment that the two |5obligations co-exist. 1 Saul Litvinoff, Obligations § 19.2, at 641, in 5 Louisiana Civil Law Treatise (1992). Compensation requires the existence of reciprocal obligations, an object of performance consisting of money or quantities of fungible things identical in kind, and an obligation that is both liquidated and presently due. LSA-C.C. Art. 1893.
Two co-existing, reciprocal obligations are present in the instant case. Seurlock was obligated to pay Lisbon for the oil it purchased. The suspended funds held by Seurlock when it answered the garnishment interrogatories represented payments for production on a fractional interest whose ownership was initially unclear. Seurlock’s answers revealed that Lisbon was in fact the owner of this interest. These unremitted production proceeds are thus a debt owed to Lisbon by Seurlock.
Lisbon, as the owner of the severed oil, was the taxpayer. LSA-R.S. 47:632. Scur-lock, as the purchaser of the oil, was responsible for withholding and remitting the taxes. LSA-R.S. 47:638. The severance taxes were normally withheld and remitted by Seurlock from payments owed to Lisbon. When Scur-lock paid the assessments for additional severance taxes from its own funds, it satisfied Lisbon’s tax liability and Lisbon became indebted to Seurlock.
Lisbon and Seurlock are thus obligated to one another. Furthermore, the object of the obligation owed by each is money. We are left only to consider whether the debts owed by the parties were liquidated and presently due.
A debt is liquidated when its existence is certain and its amount is already determined. Nonetheless, it is not necessary that the amount of a debt be fixed in order for the debt to be considered liquidated. A debt which can be ascertained by mere calculation or computation in accordance with accepted legal standards is considered liquidated. 1 Saul Litvinoff, Obligations § 19.7, at 645, in 5 Louisiana Civil Law Treatise (1992).
IfiScurlock was contractually obligated to pay for the oil it purchased. Lisbon held a working interest that entitled it to payment from Seurlock; however, a portion of these payments were held in suspense and were not remitted to Lisbon. The existence of a debt is therefore certain and the sum owed is easily quantified by reference to the total amount of funds held on behalf of the owner. The debt owed by Seurlock was thus liquidated.
The liquidity of the debt owed by Lisbon requires closer scrutiny. When faced with the additional severance tax assessment following the first audit, Seurlock paid the sums due under protest and lodged a complaint with the board of tax appeals. The arguments set forth there, and later in trial and appellate courts, reveal that Seurlock never challenged the statutory duty imposed on it to collect and remit severance taxes. Rather, Seurlock argued that it fulfilled its duties in good faith reliance on information furnished by oil producers and reliance on the certification by the Department of Revenue and Taxation of the status of the wells. The existence of an obligation to remit the severance taxes was never challenged. Moreover, Lisbon, as the taxpayer, has not denied liability for the taxes. The existence of a debt for the taxes was thus certain. Furthermore, the amount of the debt was quantified as early as April, 1983 when Seurlock put up $132,048.11 for Lisbon’s tax liability. The satisfaction of Lisbon’s obligation to pay the protested assessment created an immediate obligation on the part of Lisbon to Seurlock.
Seurlock promptly tendered its money for the delinquent taxes owed by Lisbon following the first audit[1] and immediately paid a portion of the taxes subsequently found due following the second audit. The payments made by Seurlock simultaneously created a concomitant obligation on the part of Lisbon for the taxes paid on its behalf regardless of the ultimate outcome of the protest. This obligation was not encumbered by conditions precedent or unfulfilled terms that would prevent it from being immediately due and exigible. Accordingly, the debt Lowed to *1224 Seuriock by Lisbon was presently due at the moment Scurlock paid the delinquent severance taxes on Lisbon’s behalf. Scurlock was not required to wait until the courts ultimately determined the merits of the protest to collect from Lisbon.
Likewise, the duty owed by Scurlock to pay for the oil it purchased obligated the purchaser to make payments promptly upon receipt of the oil. The proceeds held in suspense had accumulated between 1967 and 1987 and represented payments immediately due to the registered owner, Lisbon. The debt owed by Scurlock to Lisbon was therefore presently due.
The reciprocal obligations of the parties, having fulfilled the requirements for compensation, were thus ripe for set off. Based upon the foregoing, we find that the obligation owed by Scurlock to remit production proceeds to Lisbon was offset by Lisbon’s obligation to Scurlock for the delinquent severance taxes. Moreover, these debts offset one another by operation of law at the moment the two obligations existed contemporaneously. We conclude that this point occurred when Scurlock forwarded payment for delinquent severance taxes related to the Unit as identified in the first audit. This debt of $132,048.11, paid by Scurlock on April 22, 1983, exceeded the sums then held in suspense for the benefit of Lisbon. The proceeds in suspense were thus extinguished in their entirety as an off-set to the debt Lisbon owed to Scurlock. The subsequent accrual of funds in suspense has not generated funds sufficient to fully satisfy the obligation owed by Lisbon after the first audit. The production proceeds accrued from 1983 to 1987 have therefore been applied, by operation of law, to offset Lisbon’s debt to Seur-iock. From a legal standpoint, Scurlock held no funds belonging to Lisbon at the time of Arkla’s garnishment. Arkla simply garnished a credit that no longer existed.
I «CONCLUSION
Lisbon’s responsibility as a taxpayer was fulfilled in part by Scurlock when it tendered payment for delinquent severance taxes in 1983 following the first audit. Lisbon’s liability to Scurlock arose at the time of this payment and was a debt susceptible to offset via compensation. The accrued production proceeds belonging to Lisbon, and the accruals which followed, were not sufficient to satisfy Lisbon’s obligation to Seuriock. These funds were thus extinguished, by operation of law, along with a commensurate reduction in the debt Lisbon owed Scurlock. Accordingly, Scurlock holds no funds to which Arkla’s garnishment may attach. The trial court’s decision is affirmed. Costs on appeal are assigned to Arkla.
AFFIRMED.

. The Oil Well Lien Act has subsequently been amended and reenacted. Acts 1995, No. 962 § 1.

. Apparently, Seurloek never determined ownership until it had to answer the garnishment interrogatories.